## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA

### PITTSBURGH DIVISION

**CENTER FOR COALFIELD JUSTICE,**

    **Plaintiff,**

    **v.**

**W.G. TOMKO, INC.,**

    **Defendant**

Civil Action No. 2:25-cv-328

---

### PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT

Plaintiff Center for Coalfield Justice (CCJ) filed this citizen suit under the Clean Water Act (the Act or the CWA) after Defendant W.G. Tomko, Inc. (Tomko) repeatedly exceeded the limits on selenium, iron, and aluminum in its National Pollutant Discharge Elimination (NPDES) permit. When the federal Environmental Protection Agency (EPA) and Pennsylvania's Department of Environmental Protection (DEP) declined to act, CCJ invoked its statutory right under Section 505 of the Act to seek declaratory and injunctive relief, civil penalties, and attorney's fees.

Tomko now moves to dismiss on two grounds. First, it contends that CCJ lacks standing under Article III of the U.S. Constitution because the organization cannot trace its injuries to Tomko's pollution. ECF No. 21 ¶¶ 4–6 (Motion). Second, Tomko argues that the Act's citizen suit provision is unconstitutional under Article II's Executive Vesting, Take Care, and Appointments Clauses and the private non-delegation doctrine. *Id.* ¶¶ 7–9.

Both arguments fail. CCJ has adequately alleged injury-in-fact through the declaration of its member Darla Savko, whose use and enjoyment of local waterways have been impaired by Tomko's contributions to the biological impairment of Peters Creek. As for Tomko's challenge under Article III, the Clean Water Act's citizen suit provision and others like it have withstood decades of constitutional scrutiny. Tomko's premonition of a sea change in separation-of-powers jurisprudence is no basis for this Court to disregard clear and persuasive precedent. As such, the Court should deny Tomko's motion in full.

## FACTUAL BACKGROUND

Tomko provides a reasonably faithful account of the basic facts underlying this dispute. ECF No. 22 at 1–2 (Brief). Rather than recount that background, CCJ wishes only to correct one apparent misunderstanding. In previewing its arguments under Article II, Tomko shares its perspective of "exactly what is occurring" in this case: that CCJ is a "conflicted, private individual[ ]" who is "wield[ing] punitive government power . . . to settle private scores." *Id.* at 4. CCJ's motivating interests are, of course, irrelevant to the matters raised in Tomko's Motion.[1] All the same, neither CCJ nor its counsel are aware of any "private scores," nor any "conflict" that would make the maintenance of this action improper in the least. Certainly, nothing in the pleadings supports Tomko's theory that CCJ is motivated by anything beyond an honestly-held interest in "the use and protection of the waters and ecosystems of Washington County and the

---

1  *See Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 225 (1974) ("[T]he essence of standing is not a question of motivation but possession of the requisite interest that is, or is threatened to be, injured.") (cleaned up); *United States ex rel. Stone v. Rockwell International*, 282 F.3d 787, 805 (10th Cir. 2002) (upholding constitutionality of *qui tam* litigation by relators, even though "motivated solely by private financial interests that may be inimical to the Government's").

Monongahela Valley." ECF No. 20 ¶ 12 (Amended Complaint).

## LEGAL STANDARD

A complaint is susceptible to dismissal only if it lacks "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Aschcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In reviewing the pleadings, "general factual allegations of injury resulting from the defendants' conduct may suffice," as the law presumes at this stage that "general allegations embrace those specific facts necessary to support the claim.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

Passing on the constitutionality of Congressional action is "the gravest and most delicate duty that [a] Court is called upon to perform." *Blodgett v. Holden*, 275 U.S. 142, 148 (1925); *Khalil v. Joyce*, 780 F. Supp. 3d 476, 537 (D.N.J. 2025) ("Declaring a statute unconstitutional is always a fateful act, the very last resort."). Thus, when a court is "asked to invalidate a statutory provision that has been approved by both Houses of the Congress and signed by the President, particularly an Act of Congress that confronts a deeply vexing national problem, it should only do so for the most compelling constitutional reasons." *Mistretta v. United States*, 488 U.S. 361, 384 (1989)

## ARGUMENT & AUTHORITIES

### I. CCJ has organizational standing to pursue its claims.

An organization has standing to bring a case when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Students for Fair Admissions v. Harvard*

*College President & Fellows*, 600 U.S. 181, 199 (2023) (quoting *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343 (1977)).

Here, CCJ member Darla Savko would have standing to bring this suit in her own right. To meet the constitutional standing requirement, a plaintiff must be able to show (1) an "injury in fact" that is concrete, distinct, and palpable as well as "actual or imminent;" (2) a causal connection between that injury and the defendant's conduct; and (3) a "substantial likelihood" that the court can remedy the injury by granting the requested relief. *Interfaith Community Organization v. Honeywell International*, 399 F.3d 248, 254–55 (3rd. Cir. 2005).

### A. CCJ's amended complaint shows that at least one of its members has suffered an injury in fact.

Tomko moves to dismiss on the grounds that "the First Amended Complaint does not allege 'an injury in fact,' but rather raises a conjectured or hypothetical injury based solely on 'worry.'" Motion ¶ 5. To the contrary, CCJ has alleged exactly the type of injury that confers standing under the Supreme Court's landmark decision in *Friends of the Earth v. Laidlaw Environmental Services*, 528 U.S. 167 (2000). The Supreme Court there held "reasonable concerns about the effects of [pollutant] discharges" that directly affect an "affiants' recreational, aesthetic, and economic interests" are sufficient to satisfy the injury-in-fact requirement of Article III standing. *Id.* at 183–84.[2]

Analysis of the injury in fact requirement must begin with the Supreme Court's statement that "[a]t the pleading stage general factual allegations of injury resulting from the defendants' conduct may suffice, for on a motion to dismiss [the court] 'presumes that the

---

2   The Third Circuit has also held that similar health concerns and decreased enjoyment of recreational activities caused by the knowledge of a discharge are sufficient to meet the requirements of standing. *Interfaith Community*, 399 F.3d at 256.

general allegations embrace those specific facts necessary to support the claim.'" *Lujan*, 504 U.S. at 561). Tomko's acknowledgment that "CCJ has asserted that members' use and enjoyment of the area has been diminished," Brief at 6, is therefore enough to establish that CCJ has adequately alleged an injury in fact. But because the Savko declaration *does* lay out more specific facts, the discussion below details precisely how those facts establish that Tomko's discharges have injured at least one CCJ member.

The Supreme Court has consistently held that "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Laidlaw*, 528 U.S. at 183. While such an injury cannot be "conjectural or hypothetical or too remote temporally . . . an identifiable trifle is enough." *Interfaith Community*, 399 F.3d at 254 (cleaned up).

Here, Darla Savko avers that she and her family have used and continue to consistently use the section of Peters Creek downstream from (and therefore necessarily affected by) Tomko's discharges for fishing, walking, and generally enjoying the natural environment, including by watching fish and wildlife using the creek. *See* ECF No. 19-4, ¶¶ 5–12 (Savko Declaration). Savko has also alleged specific harms that she experiences when using Peters Creek as a consequence of Tomko's discharges, including decreased enjoyment of the activities she does along Peters Creek (caused by concerns about how the pollution from Tomko's facility is affecting herself, her family, her dog, the rest of the community, and the fish and wildlife in the creek) and the decreased aesthetic value of the area. *Id.* at ¶ 15. These are concrete, actual

injuries that happen to Savko every time she uses Peters Creek, which is usually at least once a week. *Id.* at ¶ 8.3

Tomko accurately describes how standing in environmental cases "hinge[s] on whether the *individual* has suffered an injury, [as] opposed to the environment. Brief at 5 (citing *Lujan*, 504 U.S. at 563). Specifically, the Supreme Court has said that the relevant showing "is not injury to the environment but injury to the plaintiff. To insist upon the former rather than the latter as part of the standing inquiry . . . is to raise the standing hurdle higher than the necessary showing for success on the merits in an action alleging noncompliance with an NPDES permit." *Laidlaw*, 528 U.S. at 181.

Given Tomko's clear acknowledgement of this principle, it is remarkable that, in the next paragraph, it insists that CCJ does not have standing because Savko's declaration did not describe the effects of Tomko's pollution on fish populations, the levels of pollutants in several bodies of water, or "the look or concentration of the water." Brief at 5. That is not the standard by which to judge standing in this case; the determination hinges instead on whether the enjoyment of the affected waters by CCJ members like Darla Savko has been, like the plaintiffs in *Laidlaw*, affected by "concerns about illegal discharges." *Laidlaw*, 528 U.S. at 182.[4] As described above, Savko has suffered such an injury in fact.

---

3   In an environmental case like this, merely "recreating near, next to, and along [a] river" is sufficient to give rise to standing. *Interfaith Community*, 399 F.3d at 257 (cleaned up).

4   On the same basis, a recent First Circuit opinion explicitly rejects the argument that a person need somehow change their behavior to be injured, holding instead that "continuing [recreational] activities but enjoying them less" is a cognizable injury. *Conservation Law Foundation v. Academy Express*, 129 F.4th 78, 89 (1st Cir. 2025).

**B. CCJ's Amended Complaint shows that at least one of its members has suffered an injury traceable to Tomko's discharges.**

Tomko next disputes the traceability of Ms. Savko's injury to its discharges, arguing that her declaration does not satisfy the three elements articulated in *Public Interest Research Group of New Jersey v. Powell Duffryn Terminals*, 913 F.2d 64, 72 (3rd Cir. 1990). Brief at 5. As relevant here, *Powell Duffryn* requires a citizen suitor allege that the defendant "1) discharged some pollutant in concentrations greater than allowed by its permit 2) into a waterway in which the plaintiffs have an interest that is or may be adversely affected by the pollutant and that 3) this pollutant causes or contributes to the kinds of injuries alleged by the plaintiffs." 913 F.2d at 72. As detailed above, however, any reliance on *Powell Duffryn* must be tempered by the Supreme Court's express disavowal in *Laidlaw* of any requirement to plead (let alone demonstrate) actual ecological harm in order to establish standing.

Tomko disputes the first two *Powell Duffryn* elements by asserting that the Amended Complaint never "allege[s] that Tomko has placed a pollutant in th[e] waters" at issue. Brief at 7.[5] But that fact obviously follows from the discharge monitoring reports identified in the Amended Complaint and abstracted in Exhibit C thereto. Complaint ¶ 30; ECF No. 19-3 (Complaint Exhibit C). The data in Exhibit C represents instances in which, according to its own records, Tomko *discharged a pollutant* at a level higher than its permit allowed.

---

5   Tomko does not suggest that Savko's recreation takes place too far away from its discharge for her injuries to be traceable to the discharge. That sort of argument would defy the judicial consensus that areas a few miles downstream of a discharge are "within the range of that discharge." *See Friends of the Earth v. Gaston Copper Recycling*, 204 F.3d 149, 162 (4th Cir. 2000); *see also Ohio Valley Environmental Coalition v. Marfork Coal*, 966 F. Supp. 2d 667, 674 (S.D. W. Va. 2013).

In identifying 1608 violation-days' worth of illegal discharges, CCJ has plainly alleged "that Tomko has placed a pollutant in th[e] waters" in which at least one CCJ member has an interest. *Powell Duffryn*, 913 F.2d at 72; *see also* Brief at 7 ("CCJ members may have an interest in the waters mentioned in the First Amended Complaint"). Tomko's further complaint that CCJ has not alleged "a change to the levels of iron, aluminum, and selenium" in the receiving streams is both wrong and irrelevant. Tomko cannot seriously dispute that the addition of a pollutant to a receiving water will necessarily "change . . . the levels" of that pollutant present therein. But again, the focus under *Laidlaw* "is not injury to the environment but injury to the plaintiff." 528 U.S. at 181.

In disputing CCJ's allegations with respect to the third *Powell Duffryn* element—that defendant's conduct contributed to the kinds of injuries alleged—Tomko relies again on a lack of identified harms to the environment. *See* Brief at 8 ("CCJ has failed to allege any noticeable change in the environment since the alleged violations."). But as this Court has acknowledged, simply identifying discharges of selenium, iron, and aluminum into a body of water is enough to support traceability to aesthetic and recreational injuries, including to a person who "walks his dog along the river in the morning and is generally 'uneasy' about the water." *PennEnvironment v. RRI Energy Northeast Management*, 744 F. Supp. 2d 466, 478, 480–81 (W.D. Pa. 2010). This is so because a plaintiff can establish traceability "merely [by] show[ing] that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged in the specific geographical area of concern." *Id.* at 480 (quoting *Gaston Copper*, 204 F.3d 149) (emphasis removed). That is precisely what CCJ has shown here. *See* Savko Declaration ¶ 15(d).

Notably, Tomko has not argued that aluminum, selenium, and iron are not dangerous to people and the environment; nor has it argued that Ms. Savko has no cause for concern over the pollution of Peters Creek. Even if it had, those arguments would be unavailing given that the limits Tomko has violated are "water quality based effluent limits,"[6] specifically calibrated to allow only "discharges that may be made without unduly impairing water quality." *City & County of San Francisco v. Environmental Protection Agency*, 604 U.S. 334, 341 (2025). Ms. Savko has declared, and CCJ has alleged, that Tomko's discharges of selenium, aluminum, and iron have directly impacted her use and enjoyment of Peter's Creek. Savko Declaration ¶¶ 13–15; Complaint ¶ 13. Those injuries are therefore traceable to Tomko's pollution.[7]

## II. Tomko's Article II challenge lacks a basis in precedent, logic, or history.

Tomko devotes the remainder of its Brief to a broadside on the constitutionality of federal citizen suit provisions. It contends that by allowing private parties to seek civil penalties and injunctive relief for permit violations, Congress violated the Executive Vesting Clause, the Take Care Clause, the Appointments Clause, and the private nondelegation doctrine. Brief at 8–19. In

---

6   *See* Pennsylvania Department of Environmental Protection NPDES Permit Fact Sheet No. PA0255858 (April 7, 2021) (enclosed as Exhibit A). Given that Tomko's NPDES permit is integral to CCJ's claims, the Court may properly "take the document into consideration in deciding [a] motion to dismiss, without converting the proceeding to one for summary judgment." *International Audiotext Network v. American Telephone & Telegraph*, 62 F.3d 69, 72 (2d Cir. 1995). The Court may also take judicial notice of relevant administrative records. *Coman v. ACA Compliance Group*, No. 2:21-cv-976, 2021 WL 5910420, at *2 (W.D. Pa. December 14, 2021).

7   Tomko does not challenge the third prong for individual standing—redressability—but it is clear that Ms. Savko's declaration satisfies that prong as well. CCJ has requested the Court order Tomko to stop violating its permit, Complaint ¶ C—relief that would increase Ms. Savko's enjoyment of Peters Creek by dispelling her concerns over Tomko's contribution to its continued degradation, Savko Declaration ¶¶ 16–18. Ms. Savko therefore fulfills the remaining requirements for individual standing.

Tomko's view, CCJ is acting as "a self-appointed mini-EPA" wielding "quintessentially executive power" in defiance of Article II. *Id.* at 8, 19.

Tomko's theory is not only wrong—it has been unanimously rejected by every court to consider it. Tomko cites no binding authority for its position, and the weight of persuasive authority points decisively in the other direction. Moreover, Tomko's interpretation ignores the structure and purpose of the Clean Water Act, misconstrues the nature of citizen suits, and disregards decades of Supreme Court precedent recognizing Congress's authority to authorize private enforcement of statutory rights. Like the many courts to confront these arguments before, this Court would do well to reject them.

**A. Unbroken lines of persuasive and binding authority refute Tomko's arguments.**

**1. The federal courts have unanimously rejected Tomko's theory.**

Tomko's theory is bold, but it isn't novel. Tomko acknowledges by footnote that at least two "district courts have rejected constitutional arguments against citizen suits." Brief at 16 n.4. But that grossly understates the weight of authority. In point of fact, at least eight district court decisions across four federal circuits have rejected Article II-based challenges to the Clean Water Act's citizen-suit provision.[8] When Article-II based challenges to other statutory citizen-suits are

---

8   *See North Carolina Shellfish Growers Association v. Holly Ridge Associates*, 200 F. Supp. 2d 551, 555–56 (E.D.N.C. 2001); *Waterkeeper Alliance v. Smithfield Foods*, No. 4:01-cv-27-H(3), 2001 WL 1715730, *5 (E.D.N.C. September 20, 2001); *Atlantic States Legal Foundation v. Universal Tool & Stamping*, 735 F. Supp. 1404, 1419–1420 (N.D. Ind. 1990); *Natural Resources Defense Council v. Shell Oil*, No. 87-5249 (S.D. Ill. February 16, 1989); *Sierra Club v. Port Townsend Paper*, No. C87-316C (W.D. Wash. May 2, 1988); *Natural Resources Defense Council v. Outboard Marine*, 692 F. Supp. 801, 815–817 (N.D. Ill. 1988); *Student Public Interest Research Group of New Jersey v. Monsanto Co.*, 600 F. Supp. 1474, 1478–79 (D.N.J. 1985) (*SPIRG*); *Chesapeake Bay Foundation v. Bethlehem Steel*, 652 F. Supp. 620, 623–26 (D. Md. 1987).

included, the number of decisions rejecting Tomko's theory expands to fourteen, across eight circuits.[9]

More important than the sheer number of these decisions is the fact that no court has held otherwise. Only by generalizing to include *all* Article II-based challenges to citizen-led litigation can Tomko locate a lone district court decision disapproving of *qui tam* actions under the federal False Claims Act. *See* Brief at 9, 18–19 (citing *United States ex rel. Zafirov v. Florida Health Associates*, 751 F. Supp. 3d 1293 (M.D. Fla. 2024)).[10] But by the same token, this Court can consult at least ten additional rulings upholding the constitutionality of *qui tam* litigation, including decisions from all four Courts of Appeals to consider the question.[11]

---

9   *See Environment Texas Citizen Lobby v. ExxonMobil*, 123 F.4th 309, 342–43 (5th Cir. 2024) (opinion of Davis, J.) (Clean Air Act); *Sierra Club v. Franklin County Power*, No. 05-cv-4095-JPG, 2006 WL 8455938, at *9–10 (S.D. Ill. October 17, 2006) (same); *United States v. American Electric Power*, 137 F. Supp. 2d 1060, 1065 (S.D. Ohio 2001) (same); *Legal Center v. Iowa Values*, 573 F. Supp. 2d 243, 256 (D.D.C. 2021) (Federal Election Campaign Act); *Delaware Valley Toxics Coalition v. Kurz-Hastings Inc.*, 813 F. Supp. 1132, 1138 (E.D. Pa. 1993) (Emergency Planning and Community Right-to-Know Act); *Atlantic States Legal Foundation v. Buffalo Envelope*, 823 F. Supp. 1065, 1072–1076 (W.D.N.Y. 1993) (same).

10  Judge Mizelle's ruling in *Zafirov* is currently on appeal, and has failed to gain acceptance even within her own district. *See, e.g.*, *Kane v. Select Medical Corporation*, No. 8:21-cv-1050-CEH-TGW, 2025 WL 1726253, *1 n.1 (M.D. Fla. June 20, 2025); *United States ex rel. Publix Litigation Partnership v. Publix Super Markets*, No. 8:22-cv-2361-TPB-AAS, No. 2025 WL 1381993, *3 (M.D. Fla. May 13, 2025) (collecting additional cases).

11  *United States ex rel. Stone v. Rockwell International*, 282 F.3d 787, 805 (10th Cir. 2002); *Riley v. St. Luke's Episcopal Hospital*, 252 F.3d 749, 757 (5th Cir. 2001) (en banc); *United States ex rel. Taxpayers Against Fraud v. General Electric*, 41 F.3d 1032, 1040-42 (6th Cir. 1994); *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 751-58 (9th Cir. 1993); *Kane v. Select Medical Corporation*, No. 8:21-cv-1050-CEH-TGW, 2025 WL 1726253, *1 n.1 (M.D. Fla. June 20, 2025); *United States ex rel. Publix Litigation Partnership v. Publix Super Markets*, No. 8:22-cv-2361-TPB-AAS, No. 2025 WL 1381993, *3 (M.D. Fla. May 13, 2025); *United States v. Sporn Co.*, No. 2:24-cv-00617, 2025 WL 1371272, at *16 (D. Vt. May 12, 2025); *United States ex rel. Wallace v. Exactech Inc.*, 703 F. Supp. 3d 1356, 1363-64 (N.D. Ala. 2023); *United States v. Halifax Hospital*, 997 F. Supp. 2d 1272, 1278 (M.D. Fla. 2014).

This "overwhelming weight" of authority in support of the constitutionality of *qui tam* litigation, *Publix*, 2025 WL 1381993, at *3, is notable given that, despite certain similarities with citizen suits, the constitutional case for *qui tam* litigation is far less clear-cut. Unlike private citizen suitors, *qui tam* relators purport to sue on the express behalf of the federal government. They need not show any concrete interest in their fraud claim, and the law they enforce is unquestionably federal in nature. As detailed below, environmental citizen suit litigation avoids those constitutional pitfalls. Thus, to the extent that the precedent on statutory citizen suits leaves any doubt as to their constitutionality, the near-universal approval of *qui tam* litigation should be conclusive.[12]

### 2. Binding precedent affirms Congress's prerogative over the levers of statutory enforcement.

A recurring theme in the decisions cited above is "the province of Congress to create statutory rights and obligations and to determine who may enforce them and in what manner." *American Electric*, 137 F. Supp. 2d at 1065 (cleaned up); *accord Chesapeake Bay Foundation*, 652 F. Supp. at 623; *SPIRG*, 600 F. Supp. at 1478; *Universal Tool*, 735 F. Supp. at 1419; *Delaware Valley*, 813 F. Supp. at 1138; *Buffalo Envelope*, 823 F. Supp. at 1073. The Supreme Court has long recognized that the creation of private rights of action and the selection of judicial remedies are decidedly *legislative* questions:

> How to effectuate policy—the adaptation of means to legitimately sought ends—is one of the most intractable of legislative problems.

---

12 CCJ also notes that, earlier this year, the Supreme Court denied a petition for certiorari challenging the Fifth Circuit's fractured decision upholding the Clean Air Act's citizen suit provision against a challenge under Article II. *See ExxonMobil v. Environment Texas Citizen Lobby*, 145 S. Ct. 2845 (2025); *see also* Petition for a Writ of Certiorari, *ExxonMobil v. Environment Texas Citizen Lobby*, No. 17-20545, at 33–35 (March 11, 2025), available at http://bit.ly/4gOEp9V.

> Whether proscribed conduct is to be deterred by qui tam action or triple damages or injunction, or by criminal prosecution, or merely by defense to actions in contract, or by some, or all, of these remedies in combination, is a matter within the legislature's range of choices.

*Tigner v. Texas*, 310 U.S. 141, 148 (1940). Accordingly, the Court has recognized in no uncertain terms that "[s]tatutory rights and obligations are established by Congress, and it is entirely appropriate for Congress, in creating these rights and obligations, to determine in addition who may enforce them and in what manner." *Davis v. Passman*, 442 U.S. 228, 241 (1979); *see also Alexander v. Sandoval*, 532 U.S. 275, 286 (2001) ("Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress.").

The Court reiterated this sentiment most recently in *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021)—a case that Tomko cites in support of its Motion. *See* Brief at 5, 10–11. The majority in *TransUnion* admonished courts to "afford due respect to Congress's decision to impose a statutory prohibition or obligation on a defendant, and to grant a plaintiff a cause of action to sue over the defendant's violation of that statutory prohibition or obligation." 594 U.S. at 425. The dissenters were even more skeptical "of second-guessing private rights" established by Congress. *Id.* at 455 (Thomas, J., dissenting).

The Supreme Court has never signaled a retreat from the principle that creation of private citizen suits is a legitimate exercise of Congress's enumerated powers. As such, Tomko's arguments would not vindicate Article II so much as deny Congress a core legislative prerogative under Article I.

### 3. Nothing in the recent removal cases undermines that precedent.

To its credit, Tomko acknowledges that courts have unanimously rejected its arguments. Brief at 16 n.4. But instead of distinguishing that authority, Tomko asks this Court to defer

instead to a general judicial zeitgeist favoring executive authority. *Id.* (citing *Selia Law v. Consumer Financial Protection Bureau*, 591 U.S. 197 (2020); *Collins v. Yellen*, 594 U.S. 220 (2021); *Trump v. United State*, 603 U.S. 593 (2024)). It claims that three recent decisions signal a paradigm shift in the separation of powers, but none of cases advance its theory.

The two primary cases on which Tomko relies, *Seila Law* and *Collins*, say nothing about citizen suits or private rights of action. Both cases address Congress's authority to condition the removal of powerful agency heads whose "potent enforcement" powers were "coupled with extensive adjudicatory authority" and a license to promulgate "binding regulations." *Seila Law*, 591 U.S. at 206; *Collins*, 594 U.S. at 254. In short, these cases address only the President's removal power,[13] and only with respect to those who "wield[ ] significant executive power." *Seila Law*, 591 U.S. at 204. To that end, the Court distinguished the cases before it from those involving only "narrowly defined" enforcement duties, *id.* at 204 (citing *Morrison v. Olson*, 487 U.S. 654 (1988)), or entities that were not "purely executive officers," *id.* at 217 (citing *Humphrey's Executor v. United States*, 295 U.S. 602, 632 (1935)).

---

13 Presidential removal is relevant only to Tomko's arguments likening CCJ to an executive "officer." Brief at 16–19. The Supreme Court flatly rejected that analogy in *Cochise Consultancy v. United States ex rel. Hunt*, 587 U.S. 262, 272 (2019), holding that federal officership is simply not an incident of litigation—even in a *qui tam* suit in which a plaintiff nominally sues "for the United States Government." Moreover, *Seila Law* and *Collins* teach that an infringement on the removal power does not warrant wholesale invalidation of the statutory scheme; it merely requires that the statute-enforcer be considered removable. Extending that logic, if CCJ's continued maintenance of this suit is at the President's whim, then it is unclear how the Court can accept Tomko's invitation to dismiss the suit entirely without itself violating Article II. *See also Garza v. Kijakazi*, No. 3:21-CV-0826-M-BH, 2022 WL 2759849, at *9–10 (N.D. Tex. June 21, 2022) ("Applying *Collins*, district courts in this circuit and across the country have held that plaintiffs raising the same constitutional challenge . . . must establish a 'link' between the adverse action and the unconstitutional tenure-protection provision to warrant relief on this basis.").

The third decision, *Trump v. United States*, is even farther afield. Tomko emphasizes its holding that "courts cannot examine the President's actions on subjects within his 'conclusive and preclusive' constitutional authority." Brief at 13 (quoting *Trump*, 603 U.S. at 620). But that merely begs the question, forcing Tomko to resort to minority opinions and law review articles in an effort to nudge all civil enforcement into the ring-fence of "conclusive and preclusive" authority. *Id.* at 11–13 (citing, *inter alia*, *United States v. Texas*, 599 U.S. 670, 689 (Gorsuch, J., concurring); Saikrishna Prakash, *The Essential Meaning of Executive Power*, 2003 Illinois Law Review 701 (2003)).

Even if Tomko's secondary authorities could preempt the Court's long-standing jurisprudence regarding statutory rights of action, they nonetheless undercut Tomko's legal theory in this case. Professor Prakash acknowledges that the "essential, original meaning of the executive power" necessarily includes a carve-out for citizen-led litigation. *Id.* at 704, 803. The ubiquity of *qui tam* statutes immediately before and after the Framing, he concludes, invites the concession that only "*governmental officials* charged with federal law execution are subordinate to the president." *Id.* at 803 n.594 (emphasis in original); *see also Vermont Natural Resources Agency v. United States ex rel. Stevens*, 529 U.S. 765, 777 (2000) (finding "history well nigh conclusive" with respect to the constitutionality of *qui tam* actions).

Of course, none of Tomko's cited authorities address the precise question of Congress's ability to effectuate policy through the creation of private rights of action. As detailed above, the precedent on that issue is clear, persuasive, and binding. This Court should therefore decline Tomko's invitation to "browse through the[ ] tea leaves and vaticinate what future holdings the

Supreme Court may (or may not) make." *United States v. Gonzalez*, 949 F.3d 30, 42 (1st Cir. 2020).

**B. Section 505 actions are premised on individuated injury and thus exist entirely outside of Article II.**

Tomko's Article II challenge rests on fundamental misconceptions about citizen suits and how they operate. Its characterization of CCJ as exercising "executive power" by "conducting civil litigation in the courts of the United States for vindicating public rights," Brief at 9, misunderstands the structure of the Act, the nature of the relief CCJ seeks, and the distinction in our legal tradition between public enforcement actions and private claims for abatement of injury.

Unlike executive enforcement actions, citizen suits under Section 505 are not brought on behalf of the United States to vindicate a generalized public interest. They are private actions brought by injured parties to abate an ongoing harm to their concrete interests. Congress designed Section 505(a)(1) to regulate the relationship between polluters and their neighbors through the peer-to-peer dynamics of private law—not the public law principles that govern the vertical relationship between government and private actors. That distinction places citizen suits beyond the reach of Article II, even when the statutory standards defining the private right happen to overlap with those the executive may enforce in a separate public proceedings.

**1. Congress may enact a statutory private right to abate water pollution and other nuisances affecting interstate commerce.**

Tomko's theory ignores a time-honored distinction between true executive power and a citizen's right to seek abatement of injurious conditions. That distinction traces a broader demarcation in our legal tradition between public law and private law:

> Put in simple terms, private law refers to bodies of legal doctrine that govern the horizontal interaction between actors, be they individuals, corporate entities, or on occasion the state acting in its

> private capacity. Public law on the other hand refers to doctrinal areas that deal with vertical interaction between the state and non-state actors, wherein the state exerts a direct and overbearing influence on the shape and course of the law.

Shyamkrishna Balganesh, *Private Law Statutory Interpretation*, 92 SOUTHERN CALIFORNIA LAW REVIEW 949, 949 (2019). On matters within the federal prerogative, Article I allows Congress to establish the law and procedure that govern either sphere. *Alexander*, 532 U.S. at 286.

In that respect, the Clean Water Act plays double-duty. In Section 309, 33 U.S.C. § 1319, the Act regulates the vertical relationship between polluters and the executive agencies primarily responsible for "the protection, development and enhancement of the *total environment itself*." Reorganization Plans 3 & 4, House Document No. 91-366 (1970) (emphasis added); *see also* 33 U.S.C. § 1365(a)(2) (governing vertical relationship between citizens and agencies). At issue in this case, however, is Section 505(a)(1), *id.* § 1365(a)(1), which regulates the horizontal relationship between polluters and citizens whose *specific environments* are degraded by the violation of environmental laws.

In evaluating the latter, horizontal aspect of the Act, it is important to remember the statutory and constitutional limits on Clean Water Act citizen suits. By its own terms, Section 505 is available only to those with "an interest [that] is or may be adversely affected" by the conduct at issue. 33 U.S.C. § 1365(g). In addition to that statutory limitation, Article III acts as an external restraint on Section 505 by requiring plaintiffs show, among other things, that a defendant's conduct inflicts on them "an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Friends of the Earth v. Laidlaw Environmental Services*, 528 U.S. 167, 180 (2000).

The Article III restraints on citizen enforcement particularly important given the

Supreme Court's recognition, throughout its standing decisions, that Articles II and III are reciprocally defined. As explained in *Lujan*, Article III's requirement for a concrete and particularized injury is a prophylactic against efforts "to transfer from the President to the courts the Chief Executive's most important constitutional duty, to 'take care that the Laws be faithfully executed.'" 504 U.S. at 577 (citing Article II, § 3). The Court returned to the interface of Articles II and III in *TransUnion*, explaining that statutory rights of action implicate the former only when they "freely authorize *unharmed* plaintiffs to sue defendants who violate federal law." 594 U.S. at 429 (emphasis in original). But when there is an "actual case" under Article III, our Constitution accepts "the displacement of the democratically elected branches." *Id*. In short, the requirement of Article III standing already screens out action that impinges on the executive's generalized duty to uphold the law.

All this is to say that the statutory and constitutional restraints on Section 505 actions ensure that citizen-suits align with principles of private law. Like the plaintiff in a tort case, "[w]hat the plaintiff must show is 'a wrong' to herself; i.e., a violation of her own right, and not merely a wrong to some one else, nor conduct 'wrongful' because unsocial, but not 'a wrong' to any one." *Palsgraf v. Long Island Railroad*, 162 N.E. 99, 100 (N.Y. 1928). In suits like this one, "[p]laintiffs are private actors suing other private actors, traditional grist for the judicial mill." *Spann v. Colonial Village*, 899 F.2d 24, 30 (1990).

The parallels to tort law are more than superficial: common law "[n]uisance principles form the core doctrinal foundation for modern environmental statues." *Cox v. City of Dallas*, 256 F.3d 281, 289 (5th Cir. 2001). Tomko's constitutional concerns quickly fall away when the Clean Water Act is understood for what it is—a science-based, systematic codification of common law

nuisance. As recognized by later decisions, the Clean Water Act essentially answers the Court's invitation in *Illinois v. Milwaukee*, 406 U.S. 91, 107 (1972), that "new federal laws and new federal regulations may in time pre-empt the field of federal common law of . . . public nuisance by water pollution." *See also Milwaukee v. Illinois*, 451 U.S. 304 (1981) (holding that CWA pre-empted interstate nuisance claims based on federal common law).

### 2. The prospect of civil penalties does not turn a private action into a public one.

The allowance of civil penalties against a citizen suit defendant is, admittedly, more of a departure from the conventions of private law. That is, presumably, why many of the failed Article II challenges cited above focused primarily on the remedy of civil penalties. *See*, *e.g.*, *SPIRG*, 600 F. Supp. at 1478; *Universal Tool*, 735 F. Supp. at 1419; *North Carolina Shellfish*, 200 F. Supp. 2d at 555.[14]

Here again, though, the Supreme Court has definitively spoken to this concern. The majority in *Laidlaw* held that, although civil penalties enrich only the public fisc, their deterrent effect redounds to the benefit of a citizen suitor who seeks not only immediate abatement but some assurance that the injuries will not recur. 528 U.S. at 185. The availability of civil penalties in this context reflects a legislative calculation that "a defendant once hit in its pocketbook will surely think twice before polluting again." *Id.* That sort of "congressional determination warrants judicial attention and respect." *Id.* In any case, deterrence is not an alien concept in

---

14 The nature of Tomko's challenge is less clear. Its underlying Motion attacks the citizen suit in its entirety, Motion ¶¶ 7–9, but the arguments in its Brief center largely around civil penalties, *see*, *e.g.*, Brief at 8–9 & n.1. Tomko's request that the Court also dismiss CCJ's claims under the Pennsylvania Clean Streams Law, *id.* at 20 n.5, however, suggests that Tomko aims to leave no federal question intact. *See Doe v. Mercy Catholic Medical Center*, 850 F.3d 545, 567 (3d Cir. 2017) (holding that survival of federal claims precludes court from declining supplemental jurisdiction)

private law. To the contrary, "*every* tort rule, to some extent, is designed both to deter and to compensate." *Warriner v. Stanton*, 475 F.3d 497, 500 (3d Cir. 2007) (emphasis added).

**C. Tomko's theory cannot account for the significant involvement of states in the Act's regulatory scheme.**

In addition to the flaws detailed above, Tomko's theory fails to account for the significant role of state law—both in this suit and in the overarching regulatory structure. The Act is among the many federal environmental statutes that employ a model of "cooperative federalism." Within that model, states may propose their own NPDES permitting program. 33 U.S.C. § 1342(b). If EPA determines that a state program complies with the regulatory floor set by Congress, it can "authorize a State to supplant the federal permit." *Department of Energy v. Ohio*, 503 U.S. 607, 611 (1992). Once a program is approved, "state officials have the primary responsibility for reviewing and approving NPDES discharge permits." *Piney Run Preservation Association v. Carroll County Commissioners*, 523 F.3d 453, 456 (4th Cir. 2008). At that point, state and federal regulators share authority to enforce permit conditions through civil actions, criminal charges, or administrative penalties. 33 U.S.C. § 1319.

This brand of "cooperative federalism" poses two problems for Tomko's theory. First, the permit CCJ seeks to enforce in this case was issued by a Pennsylvania agency, acting under the laws of the Commonwealth. The effluent limitations contained in Tomko's permit were developed under Pennsylvania's EPA-approved NPDES program—not the federal backstop. To be sure, this Court has previously concluded that the question of whether a Pennsylvania permittee "has violated [the] CWA by exceeding its NPDES Permit effluent limitations is one of federal law." *PennEnvironment v. Genon Northeast Management*, No. CIV. A. 07-475, 2011 WL 1085885, at *6 (W.D. Pa. March 21, 2011). But notwithstanding the procedural overlay of federal

*enforcement*, the effluent limitations in Tomko's permit are still determined by Pennsylvania regulators in accordance with Pennsylvania law. *Cf. Department of Energy*, 503 U.S. at 624–25 (holding that civil penalties for the violation of a state-issued NPDES permit do not "arise under federal law" for purposes of the CWA's sovereign immunity waiver); *see also* Ernest A. Young, *States in the Separation of Powers*, 48 Harvard Journal of Law & Public Policy 1, 22–23 (2025) ("[S]tate officials implementing federal law do so pursuant to agreements between their governments and the federal government; their power to execute these agreements stems from their state constitutions, not 'the executive power' vested in the President under Article II.").

A second, related problem for Tomko is the existence of concurrent authority of state and federal regulators to enforce permit conditions. Indeed, states actually occupy the superior enforcement position. *See* 33 U.S.C. § 1319 (requiring EPA provide states with notice before or coincident with taking enforcement action). Yet, from the perspective of Article II, there is no meaningful difference between a state agency and a private citizen; neither is a federal officer subject to the President's control or removal. *New York v. United States*, 505 U.S. 144, 188 (1992) ("The positions occupied by state officials appear nowhere on the Federal Government's most detailed organizational chart."). A commitment to Tomko's theory, then, would oust not only private citizens, but also state authorities from the federal enforcement scheme.

Tomko may well believe that Congress exceeded its authority in engineering a statute that relies so heavily on a "a partnership between the States and the Federal Government . . . to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." *Arkansas v. Oklahoma*, 503 U.S. 91, 101 (1992). But according to Justice Scalia's majority opinion in *Printz v. United States*, "cooperative federalism" is entirely reconcilable with Article II: even

though "control by the unitary Federal Executive [is] sacrificed when States voluntarily administer federal programs," the "condition of voluntary state participation significantly reduces the ability of Congress to use this device as a means of reducing the power of the Presidency." 521 U.S. 898, 923 n.12 (1997). Because the Supreme Court has given its constitutional blessing to this arrangement, it would be inappropriate for this Court to nullify the "numerous federal statutory schemes" that rely on it. *New York*, 505 U.S. at 167 (collecting examples).

**D. Citizen enforcement in no way interferes with the President's ability to perform his constitutional duties.**

Although Tomko reads the recent presidential removal cases as a sea change in separation-of-powers jurisprudence, Brief at 16 n.4, the Justices have not articulated a new standard for evaluating situations in which Congress authorizes only narrow, independent enforcement through the judicial process. To the extent such authorization implicates Article II at all—as detailed above, it often does not—the controlling authority remains *Morrison v. Olson*.

The Court in *Seila Law* expressly refused to revisit *Morrison*, 591 U.S. at 229, and it noted at the outset that it was presented with government officials "[u]nlike the independent counsel [in *Morrison*], who lacked policymaking or administrative authority," *id.* at 219. *Morrison*, by contrast, addressed head-on the concerns over extra-executive enforcement articulated in Tomko's Motion. Accordingly, commentators agree that *Morrison* provides the closest analog to citizen suits in the Supreme Court's Article II jurisprudence. *See* Stephen M. Johnson, *Private Plaintiffs, Public Rights: Article II & Environmental Citizen Suits*, 49 KANSAS LAW REVIEW 383, 394 (2001). Thus, even assuming that citizen suits raise concerns under Article II, *Morrison*

continues to define the proper standard for evaluating enforcement by those "who lack [any] policymaking or administrative authority." *Seila Law*, 591 U.S. at 219.

Under *Morrison*, the determinative question is whether an alternative enforcement scheme "prevent[s] the Executive Branch from accomplishing its constitutionally assigned functions." *Morrison*, 487 U.S. at 695 (quoting *Nixon v. Administrator of General Services*, 433 U.S. 425, 433 (1977)). Citizen enforcement under the Clean Water Act easily passes that test.

*First*, the Act gives federal authorities the power to entirely preempt a citizen suit before it is filed, as well as myriad ways to exert influence over an already-pending action. *See generally* 33 U.S.C. § 1365(b)–(c); *Laidlaw*, 528 U.S. at 188 n.4 ("[T]he Federal Government retains the power to foreclose a citizen by undertaking its own action. And if the Executive Branch opposes a particular citizen suit, the statute allows the Administrator of the EPA to intervene as a matter of right and bring the Government's views to the attention of the court.").

*Second*, even absent citizen-led litigation, the Act still resigns executive enforcement to a "residual Federal role for the rare but important cases where State enforcement actions are inadequate to fully protect public health and the environment." Senate Report No. 257, 103d Congress, 2d Session 90 (1994) (quoted in David R. Hodas, *Enforcement of Environmental Law in a Triangular Federal System*, 54 Maryland Law Review 1552, 1645 n.520 (1995)). This is not an area in which the federal government has a monopoly on enforcement, and the impact of citizen-led enforcement on executive priorities is far less than the influence of the administering state.

*Third*, citizen enforcement does not improperly subvert prosecutorial discretion. Tomko's argument to the contrary—Brief at 11, 13—relies primarily on *Heckler v. Chaney*, 470 U.S. 821 (1985). But that case holds that "an agency's decision not to take enforcement action

. . . is only *presumptively* unreviewable." *Id*. at 832 (emphasis added). *Heckler* affirms Congress's power to cabin prosecutorial discretion by enacting a "substantive statute [that] provide[s] guidelines for the agency to follow in exercising its enforcement power." *Id*. at 833.

*Fourth*, Tomko's argument that citizen enforcement prevents the President from "tak[ing] care that the laws be faithfully executed," Brief at 10, is illogical. Professor Shane effectively breaks down the argument :

> Plaintiffs in citizen or qui tam suits follow one of two possible fates—they lose or they win. If they lose, whether the defendant is the government or a private party, the government's discretion remains intact. If they win against a private party, the result can only be deemed consistent with the constitutional command that the laws 'be faithfully executed.' A plaintiff's victory hardly undermines the executive obligation to 'take care' that faithful execution occur. (And, of course, in the actions [under the Clean Water Act], Congress even authorized the executive to take control of the litigation at its discretion.

Peter M. Shane, *Returning Separation-of-Powers Analysis to its Normative Roots: The Constitutionality of Qui Tam Actions & Other Private Suits to Enforce Civil Fines*, 30 Environmental Law Reporter 11081, 11093 (2000).

*And finally*, Tomko's enthusiasm for executive enforcement is understandable given its current exposure to liability. But in evaluating the extent to which citizen enforcement actually frustrates executive prerogatives, the Court should give far greater weight to the executive's own pronouncements on this issue.[15] Traditionally, the unitary executive has not shared Tomko's concerns. In the face of an Article II challenge, then-U.S. Attorney Samuel Alito formally defended the constitutionality of Section 505 as "a valuable adjunct to federal enforcement of the

---

15  The federal government may yet volunteer an opinion in this case. *See* 28 U.S.C. § 2403. If it does, CCJ believes that both parties should have an opportunity to respond in kind.

Clean Water Act. The provisions, responsibly employed, provide a useful supplement to federal and state enforcement resources and a strong additional deterrent to future violations." *See* Brief of the United States as Amicus Curiae in Support of the Constitutionality of Section 505 of the Clean Water Act, *Public Interest Research Group of New Jersey v. Rollins Environmental Services*, No. 86-3438, at 2 (D.N.J. April 1987) (enclosed as Exhibit B). Together with the other mitigating factors outlined above, this executive defense of citizen enforcement precludes any argument that Section 505 violates the functional standard applied in *Morrison.*

## III. TOMKO'S MOTION SEEKS INAPPROPRIATE RELIEF.

Tomko requests both judgment in its favor, Motion at 3, as well as dismissal of all claims "with prejudice," Brief at 20. Setting aside the legal merits of Tomko's arguments, neither form of relief is available to it. Dismissal under Rule 12 is certainly a "disposition," but it does not operate as a judgment on behalf of the movant. That distinction can make a difference in Clean Water Act proceedings—especially those, like this one, that include pendent state law claims. *See, e.g.*, *Parker v. Scrap Metal Processors*, 468 F.3d 733, 744–47 (11th Cir. 2006). And dismissal for want of standing is *never* with prejudice. As the Third Circuit recently explained, "[e]ven when a district court determines that granting leave to amend would be futile, . . . a dismissal for lack of Article III standing must be 'without prejudice.'" *Cook v. GameStop Inc.*, No. 23-2574, 2025 WL 2250261, *7 (3d Cir. August 7, 2025).

## CONCLUSION

For the reasons detailed above, CCJ respectfully requests that the Court deny Tomko's motion and affirm the critical role of private citizens in the Act's triangular enforcement scheme.

Dated: September 30, 2025

Respectfully submitted,

**Evan Dimond Johns**
   (Pennsylvania ID No. 334608)
**Thomas L. Kloehn**
   (Pennsylvania ID No. 336940)
Appalachian Mountain Advocates
6101 Penn Avenue, Suite No. 201
Pittsburgh, Pennsylvania 15206
Telephone: (434) 738 – 1863
           (773) 332 – 0551
E-Mail: ejohns@appalmad.org
       tkloehn@appalmad.org

*Counsel for Plaintiff Center for Coalfield Justice*

CERTIFICATE OF SERVICE

I certify that on September 30, 2025, I filed the foregoing Brief in Opposition to Defendant's Motion to Dismiss First Amended Complaint with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the below-named CM/ECF participants:

**Richard J. Cromer**
Leech Tishman Fuscaldo & Lampl
525 William Penn Place, Twenty-Eighth Floor
Pittsburgh, Pennsylvania 15219

**Steven M. Toprani**
W.G. Tomko Inc.
2559 State Route 88
Finleyville, Pennsylvania 15332

**Evan Dimond Johns**
  (Pennsylvania ID No. 334608)
Appalachian Mountain Advocates
6101 Penn Avenue, Suite No. 201
Pittsburgh, Pennsylvania 15206
Telephone: (434) 738 – 1863
E-Mail: ejohns@appalmad.org

*Counsel for Plaintiff Center for Coalfield Justice*