

EXHIBIT B

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

PUBLIC INTEREST RESEARCH )
GROUP OF NEW JERSEY, INC., ET AL., )
                      )    Hon. Joseph H. Rodriguez
         Plaintiffs   )    Civ. No. 86-3438
                      )
    v.                  )    Oral Argument is
                      )    Scheduled for May 1, 1987
ROLLINS ENVIRONMENTAL SERVICES INC.,)   at 9:30 A.M.
                      )
         Defendant    )
_____)

BRIEF OF THE UNITED STATES AS AMICUS CURIAE
IN SUPPORT OF THE CONSTITUTIONALITY OF SECTION
505 OF THE CLEAN WATER ACT

_____

F. HENRY HABICHT II
Assistant Attorney General

SAMUEL A. ALITO, JR.
United States Attorney
Newark, New Jersey 07012

NANCY B. FIRESTONE
DOUGLAS A. COHEN
Attorney, Department of Justice
Washington, D.C.  20530
(202) 633-1442

# TABLE OF CONTENTS

| | Page |
|---|---|
| INTEREST OF THE UNITED STATES........................ | 1 |
| QUESTION PRESENTED................................... | 3 |
| ARGUMENT............................................. | 3 |
| Section 505 of the Clean Water Act, Authorizing Judicial Assessment of Civil Penalties and Injunctive Relief in Citizen Actions, is Constitutional. | 3 |
| A.  Introduction and Summary................... | 3 |
| B.  In enacting Section 505, Congress has not eliminated the Executive's constitutionally authorized role to enforce the Clean Water Act........................................ | 8 |
| C.  Section 505 does not represent an unconstitutional delegation of governmental power to private citizens............................ | 12 |
| D.  Section 505 does not result in an unconstitutional interference with the prosecutorial powers of the Executive Branch.............. | 21 |
| CONCLUSION........................................... | 26 |

## TABLE OF AUTHORITIES

| | Page |
|---|---|
| **Cases:** | |
| Adams v. Woods, 6 U.S. (2 Cranch) 336 (1805)......... | 18 |
| Blodgett v. Holden, 275 U.S. 142 (1925).............. | 4 |
| Bowsher v. Synar, 106 S. Ct. 3181 (1986)............ | 8,9,10, 11 |
| Buckley v. Valeo, 424 U.S. 1 (1976)................. | 8,9,11,20 |
| Chesapeake Bay Foundation v. Bethlehem Steel Corporation, 608 F. Supp. 440 (D. Md. 1985).............. | 19 |

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| PUBLIC INTEREST RESEARCH GROUP OF NEW JERSEY, INC., ET AL., | ) ) ) | |
| Plaintiffs | ) ) | Hon. Joseph H. Rodriguez Civ. No. 86-3438 |
| v. | ) ) | Oral Argument is Scheduled for May 1, 1987 |
| ROLLINS ENVIRONMENTAL SERVICES INC., | ) ) | at 9:30 A.M. |
| Defendant | ) ) | |

BRIEF OF THE UNITED STATES AS AMICUS CURIAE
IN SUPPORT OF THE CONSTITUTIONALITY OF SECTION
505 OF THE CLEAN WATER ACT

---

INTEREST OF THE UNITED STATES

The Clean Water Act, 33 U.S.C. 1251 <u>et</u> <u>seq</u>. (the CWA),
sets forth a national program for the reduction and eventual
elimination of water pollution.  The United States, through the
Environmental Protection Agency (EPA), plays a lead role in
enforcing the CWA.  The United States therefore has a strong
interest in preserving the CWA's carefully constructed program for
coordinated enforcement through federal, state, and private action.
The present case involves the constitutionality of private "citizen
suit" actions under Section 505.  33 U.S.C. 1365.  Its resolution
will have a direct and substantial effect on systematic enforcement
of the Act.  Section 402 of the Act establishes the National Pollu-
tant Discharge Elimination System ("NPDES"), a permit program that
regulates all point source discharges of pollutants into waters of

the United States.  33 U.S.C. 1342.  Section 309 provides for
federal enforcement to ensure that all discharges into navigable
waters of the United States comply with the Act.  33 U.S.C. 1319.
Section 505 provides, in addition, for private actions by adversely
affected individuals, subject to certain important limitations.
33 U.S.C. 1365.  Under Section 505, the federal government may
intervene as of right in any citizen initiated action.  The United
States considers the Section 505 "citizen suit" provisions a
valuable adjunct to federal enforcement of the Clean Water Act.  The
provisions, responsibly employed, provide a useful supplement to
federal and state enforcement resources and a strong additional
deterrent to future violations.

This case involves a Section 505 citizen action by the
Public Interest Research Group of New Jersey, Inc. ("NJPIRG")
against Rollins Environmental Services Inc. ("Rollins").  The United
States has previously declined to participate as an intervenor in
the action and takes no position on the general merits of this
case.[1]  However, this Court has informed the Attorney General that
Rollins has filed a motion to dismiss and for summary judgment
challenging the constitutionality of Section 505.  Accordingly, the

---

[1]  In accordance with Section 505(b), 33 U.S.C. 1365(b), NJPIRG
notified the Environmental Protection Agency ("EPA") of its
intention to bring this action.  Based on considerations of optimal
utilization of agency resources, EPA's decision to date has been
not to intervene in this case.  See 33 U.S.C. 1365(c)(2).

United States submits this brief as <u>amicus</u> <u>curiae</u> solely on the constitutionality of Section 505. 2/

QUESTION PRESENTED

The United States will address the following question of law raised by Rollins in its motion to dismiss and for summary judgment:

> Whether Section 505 of the Clean Water Act, which permits a court to order injunctive relief and assess civil penalties in citizen initiated actions, violates the Constitution's separation of powers.

ARGUMENT

Section 505 of the Clean Water Act, Authorizing Judicial Assessment of Civil Penalties and Injunctive Relief in Citizen Actions, is Constitutional.

Introduction and Summary

Rollins argues that Section 505, the citizen suit provision of the Clean Water Act, 3/ is unconstitutional on the

_____

2/ The United States reserves its rights to intervene at a later date under Section 505(c) or under 28 U.S.C. 2403(a). The latter statute provides in pertinent part:

> In any action, * * * in a court of the United States to which the United States * * * is not a party, wherein the constitutionality of any Act of Congress affecting the public interest is drawn in question, the court shall certify such fact to the Attorney General, and shall permit the United States to intervene * * * for argument on the question of constitutionality.

28 U.S.C. 2403(a).

3/ Section 505(a) provides in pertinent part:

(continued...)

grounds that it violates the constitutional doctrine of separa-
tion of powers. Undaunted by the Supreme Court's apparent
approval of the citizen suit provisions, see <u>Middlesex County
Sewerage Authority</u> v. <u>National Sea Clammers Ass'n</u>, 453 U.S. 1, 14
(1981), Rollins asks this Court to take the extraordinary action
of striking down Section 505. <u>4</u>/ This Court explicitly upheld

---

<u>3</u>/ (...continued)

      Except as provided in subsection (b) of this section
and section 309(g)(6), any citizen may commence a civil
action on his own behalf --

      (1) against any person * * * who is alleged to be in
violation of (A) an effluent standard or limitation
under this chapter or (B) an order issued by the
Administrator [of the EPA] or a State with respect to
such a standard or limitation * * *.

      \* \* \* \*

      The district courts shall have jurisdiction * * * to
enforce such an effluent standard or limitation, or
such an order * * * and to apply any appropriate civil
penalties under Section 1319(d) of this title.

33 U.S.C. 1365(a). Subsection (b) requires that sixty days'
notice be given to EPA, the relevant State and the alleged
violator prior to commencement of the action. 33 U.S.C.
1365(b)(1). It also provides that no action may be commenced if
EPA or the State is "diligently prosecuting" an enforcement
action. <u>Id.</u> Section 1319(d) provides for civil penalties not to
exceed $25,000 per day of violation. 33 U.S.C. 1319(d), as
amended by the Water Quality Act of 1987 (101 Stat. 7). Section
505(c) was amended by the Water Quality Act of 1987, to add a new
paragraph (3) which provides that no consent decree shall be
entered prior to 45 days after receipt by the Attorney General
and the Administrator of EPA.

<u>4</u>/ The determination of constitutionality is "the gravest and
most delicate duty that this Court is called upon to perform."
<u>Blodgett</u> v. <u>Holden</u>, 275 U.S. 142, 148 (1925). It is this Court's
duty, as it is ours, to construe this statute in a manner that
sustains its constitutionality, if it is possible to do so. See,
<u>e.g.</u>, <u>Rostker</u> v. <u>Goldberg</u>, 453 U.S. 57, 64 (1981). In consider-
                                                        (continued...)

Section 505, in <u>SPIRG</u> v. <u>Monsanto</u>, 600 F. Supp. 1474 (D. N.J. 1985), in the face of constitutional arguments similar to those raised by Defendant here. [5]/ We fully agree with NJPIRG's ultimate conclusion of constitutionality. [6]/

In order to advance the ambitious goals of the Clean Water Act, including those of the National Pollutant Discharge Elimination System program, Congress created a broad array of Federal (and State) enforcement tools, chief among which are the

---

[4]/ (...continued)
ing the constitutionality of a statute enacted by Congress, the Court is "obligated to move cautiously, and to avoid declaration of invalidity if it is possible to do so." <u>Melcher</u> v. <u>Federal Open Market Committee</u>, 644 F. Supp. 510, 521 (D. D.C. 1986).

[5]/ See, also, <u>Chesapeake Bay Foundation, Inc., and Natural Resources Defense Council</u> v. <u>Bethlehem Steel Corporation</u>, 652 F. Supp. 620 (D. Md. 1986), involving a challenge to the constitutionality of the same citizen suit provision at issue here, where the court found that Bethlehem Steel's argument that the citizen suit provision violates the separation of powers principle by granting to private persons those powers exclusively reserved for the executive to be "fundamentally flawed." The court found that:

> "defendant ignores the principle that Congress creates statutory rights and obligations, and it determines who may enforce them and in what manner." <u>Chesapeake Bay Foundation</u>, 652 F. Supp. at 623.

Both <u>SPIRG</u> v. <u>Monsanto</u> and <u>Chesapeake Bay</u> v. <u>Bethlehem Steel</u> provide the court with clear, unambiguous precedent that specifically addressed and resolved the constitutional concerns raised here by Rollins and the courts concluded that the separation of powers issue is not triggered, and the citizen suit provision is not unconstitutional.

[6]/ Nonetheless, NJPIRG's brief contains a number of broadly drawn arguments and statements with which we do not concur. Those issues will be addressed below.

enforcement authorities set forth in Section 309. [7/]   For

example, Section 309(a)(3) authorizes the Administrator to take

enforcement action "[w]henever on the basis of any information

available to him [he] finds that any person * * * is in violation

of any permit condition or limitation * * * in a permit issued

under section 1342 of this title by him or by a State * * * " (33

U.S.C. 1319(a)(3)).   Upon such a finding, the Administrator may

either "issue an order requiring such person to comply with such

* * * requirement," or may commence a civil action pursuant to

Section 309(b) (33 U.S.C. 1319(b)).   [8/]   In turn, Section 309(b)

authorizes the Administrator to commence a civil action "for

appropriate relief, including a permanent or temporary injunc-

tion," whenever he is authorized to act under Section 309(a).

The Act also provides for both civil and criminal

penalties.   Section 309(d) provides for civil penalties of up to

$25,000 per day for each violation of specified requirements of

the Act, including any condition or limitation in a State or

federal NPDES permit.   33 U.S.C. 1319(d) (as amended by 101 Stat.

7, Sec. 313(b)(1)).   In addition, Section 309(c) provides for

criminal penalties of up to $25,000 per day of violation and one

---

[7/]   Congress also provided that a State may be authorized under
Section 402 to implement a State permit program in place of the
federal NPDES program but only if the State demonstrates, _inter
alia,_ that it has adequate authority to enforce against permit
program violations (33 U.S.C. 1342(b)(7)).

[8/]   In addition, Section 309(a)(1) provides that upon finding a
person to be in violation of a State-issued permit, the
Administrator may notify the issuing State of the violation
thirty days before taking federal enforcement action.

year imprisonment for negligent violation of any NPDES permit condition or limitation, and penalties of up to $50,000 per day and three years imprisonment for knowing violations. 33 U.S.C. 1319(c), as amended by 101 Stat. 7, Sec. 312. Finally, the 1987 amendments to the Clean Water Act create new authority under which EPA may impose administrative penalties of up to a total of $25,000 through an informal hearing, or up to a total of $125,000 through a formal hearing. 33 U.S.C. 1319(g) (as added by 101 Stat. 7, Sec. 314).

As a supplement to these wide-ranging governmental enforcement powers, Congress in Section 505(a) authorized "any citizen" to commence a civil action against "any person who is alleged to be in violation" of certain enumerated provisions and requirements of the Act, including any condition or limitation of any NPDES permit. 33 U.S.C. 1365(a). Yet, this citizen suit authority is not co-equal to the federal enforcement powers created by Section 309. 2/ In particular, Congress limited the scope of the authority to sue granted in Section 505(a) by providing in subsection (b) that no citizen action could be initiated if EPA or the State had already commenced and was "diligently prosecuting" a civil or criminal action in federal or state court. Moreover, Congress required in Section 505(b) that potential citizen plaintiffs must notify EPA and the State sixty

2/ Defendant argues that the citizen enforcement authority is "an authority identical in all substantive respects ..." to federal enforcement authority (Def. Br. 48). We respectfully disagree for the reasons outlined herein.

days before initiating a citizen suit, and provide the government with a copy of the complaint upon filing of the citizen action. These provisions afford the government an opportunity to determine whether to take "preemptive" enforcement action or, alternatively, to intervene as of right or to participate as amicus in the citizen suit. As noted supra, Congress further limited Section 505 authority in the recently enacted Water Quality Act of 1987, 101 Stat. 7, by providing that the court may not enter a consent decree resulting from a Section 505 citizen suit action until 45 days after receipt of such decree by the Administrator and the Attorney General. [10]/

> B. In enacting Section 505 Congress has not eliminated the Executive's constitutionally authorized role to enforce the Clean Water Act.

Defendant argues that Bowsher v. Synar, 106 S. Ct. 3181 (1986), Northern Pipeline Construction Co. v. Marathon Pipe Line Co., 458 U.S. 50 (1982), and Buckley v. Valeo, 424 U.S. 1 (1976), establish constitutional principles which, when applied to Section 505 of the Clean Water Act, make clear that citizen suits are unconstitutional as a violation of the separation of powers doctrine. Defendant contends that this proscribed congressional "encroachment or aggrandizement" has been manifest in three ways: (1) through the elimination of a constitutionally-authorized role

---

[10]/ Here, the Administrator and the State did not choose to initiate governmental enforcement during the sixty-day notice period, and NJPIRG thus was not barred from filing a complaint, for injunctive relief and the concomitant civil penalties, alleging that Rollins was in violation of its NPDES permit.

of another branch; (2) through Congressional involvement in the appointment of individuals to carry out executive functions; and (3) through the vesting of another Branch's powers in individuals who, although chosen without congressional involvement, are still not empowered as required by the Constitution. (Def. Br. 68-69) A close examination of those cases does not, however, support Defendant's argument.

In both Buckley v. Valeo and Bowsher v. Synar, the Congress retained for itself the power to appoint (or remove) those charged with enforcing the laws it passed. In Buckley, the Congress created a Federal Elections Commission composed of eight persons, only two of whom were appointed by the President. The Commission had wide-ranging rulemaking and enforcement power, including the authority to seek judicial relief. The Federal Election Commission was the principal organ through which the Federal Election Campaign Act was enforced, and once all appointments were made, it operated largely beyond the President's control. Congress may not enact a law and then create a system of implementation which only permits enforcement of that law by officials selected by and serving at the pleasure of the legislative branch, thus bypassing the executive branch.

Bowsher v. Synar addressed constitutional issues related to the Balanced Budget and Emergency Deficit Control Act of 1985, popularly known as the "Gramm-Rudman-Hollings Act." In the Gramm-Rudman-Hollings Act, Congress had delegated to the Comptroller General -- an official nominated by the President,

and confirmed by Congress, but dismissable only at the initiative of Congress -- the authority to designate mandatory cuts in the Federal budget if certain deficit reduction targets were not met. The Court found that the Act violated the purpose of the separating and dividing of powers, which was to "diffus(e) power the better to secure liberty." <u>Bowsher</u> at 3186, (citing <u>Youngstown Sheet and Tube Company</u> v. <u>Sawyer</u>, 343 U.S. 579, 635 (1952) (Jackson, J., concurring)). The mandatory cuts in the Federal budget were triggered by the Comptroller General, a non-Exective Branch official who is not subject to the President's direction. Once the Comptroller General had designated the required budget reductions, the President was <u>required</u> to act in conformance with his report. 2 U.S.C. 250(a)(3). This kind of complete divestiture of Presidential control over the execution of the laws is constitutionally impermissible. <u>Id.</u> at 3189-92.

Defendant relies on <u>Northern Pipeline</u> for the self-evident proposition that legislative encroachment on another Branch's authority is not limited to situations of congressional self-aggrandizement. Def. Br. 75-76. <u>Northern Pipeline</u> involved the delegating of all Judicial Branch bankruptcy authority to a non-Article III court. In his plurality opinion, Justice Brennan found that the Framers designed the federal judiciary to "stand independent of the Executive and Legislature -- to maintain the checks and balances of the constitutional structure, and also to guarantee that the process of adjudication itself remained impartial." <u>Northern Pipeline</u> at 58. Justice Brennan concluded

that the "judicial power of the United States must be exercised by the courts having the attributes prescribed in Article III" 11/ (Id. at 59), subject to those exceptional situations where the creation of legislative courts is not prohibited. The Bankruptcy Court established by Congress did not have the attributes of an Article III court and, thus, could not exercise all of the judicial power of the United States in the bankruptcy realm.

The statutes involved in these cases have in common two central features: (1) branches of the federal government were denied the authority to exercise their constitutionally-allocated functions, and (2) the authority to exercise clearly governmental power was granted to persons not constitutionally permitted to exercise it, (i.e., Buckley -- legislation vests wide-ranging law enforcement powers in officials beyond the control of the President; Bowsher -- execution of a critical element of the budget law is delegated to Comptroller General who is insulated from Presidential authority; and Northern Pipeline -- all bankruptcy adjudications are assigned to a non-Article III court, circumventing the Judicial Branch. In each of those cases, then,

---

11/ The attributes of Article III judges include service for life subject to continued "good behaviour," and salaries free from diminution by Congress. Justice Brennan found that "[b]oth of these provisions were incorporated into the Constitution to ensure the independence of the Judiciary from the control of the Executive and Legislative Branches of government." Northern Pipeline at 59.

governmental power was shifted from its rightful possessor to a person not entitled to have it.

This case has neither of those features. As we shall show below, the nuisance-like cause of action created for private citizens by Section 505 is in no way identical to the Executive's power to execute the law. Moreover, that power is left completely intact by the Clean Water Act, and indeed is specifically respected by Section 505. The Executive can "preempt" citizen action by commencing and diligently prosecuting a civil or criminal action in Federal court; the Executive can intervene as a matter of right in the citizen action; the Executive is not bound by the resolution of the citizen action; the Executive must have notice of the citizen's intent to sue at least 60 days prior to the initiation of the suit and must receive a copy of the complaint upon filing of the action; and the Executive has the authority to review and object to the consent decree and settlement in citizen actions prior to their being entered by the court. Therefore, Section 505 is not analogous to <u>Buckley</u>, <u>Bowsher</u>, and <u>Northern Pipeline</u>, where the constitutionally-designated Branch was impermissably disabled from exercising its lawful authority. Despite a Section 505 citizen action, the President can still fully utilize his executive authority to see the laws faithfully executed.

C.  Section 505 does not represent an unconstitutional delegation of governmental power to private citizens.

An examination of Section 505 demonstrates that it does not unconstitutionally assign governmental power to private

citizens.  Defendant's argument is premised on the erroneous
assumption that citizens, under Section 505, are asserting
governmental rights and powers.  To the contrary, a careful
review of Section 505 and its limitations can only result in the
conclusion that citizens are asserting their own rights, not
those of the Executive Branch. 12/  Section 505 invests a
particular class of private citizens 13/ with circumscribed
powers 14/ to seek judicial enforcement of certain provisions 15/
of the Clean Water Act.  Strictly speaking, it does not represent
a delegation at all; Section 505 does not transfer, distribute,
or reinvest any pre-existing law enforcement powers.  As noted
above, the Executive Branch retains full authority to act to

---

12/  For example, citizen actions under Section 505 of the Clean
Water Act have no preclusive effect on actions of the United
States under the Act.  See infra, n. 31.

13/  Citizen suits are available only to parties whose interests
are or may be adversely affected by a defendant's unlawful
pollution.  Citizens must demonstrate judicially cognizable
injury in fact within the meaning of Sierra Club v. Morton, 405
U.S. 727 (1972).  See Sierra Club v. SCM Corp., 747 F.2d 99 (2d
Cir. 1984).  In enacting Section 505, Congress did not and,
indeed, could not waive Article III standing requirements.
Gladstone Realtors v. City of Bellewood, 441 U.S. 91, 100 (1979).
This is another significant limitation on the citizen suit
authority of Section 505.  Only those citizens meeting these
standing requirements can maintain an action under Section 505.

14/  Citizen actions are subject to a variety of limitations,
including notice requirements, 33 U.S.C. 1365(b)(1)(A), and
foreclosure by federal or state enforcement actions, 33 U.S.C.
1365(b)(1)(B).  See supra at 12.

15/  Citizen suits can be directed only at certain violations of
the Clean Water Act.  See 33 U.S.C. 1365(f).

remedy violations, regardless of the outcome of Section 505 action. Instead, Section 505 is best viewed as a legislative creation of a limited cause of action in private citizens. This conferral, when measured against the relevant legal principles, is clearly permissible. While the constitution vests the national Executive power in the President and contemplates that Congress shall rely principally on Executive Branch action to ensure compliance with civil laws, it does not prohibit congressional recognition of limited legal rights in private citizens to remedy and prevent demonstrable injury-in-fact that they suffer. Cf. Ouellette v. IPC, 55 U.S.L.W. 4138 (Jan. 21, 1987).

The Constitution authorizes Congress to make all laws "which shall be necessary and proper" to execute its enumerated constitutional powers. U.S. Const. Art. I, § 7, cl. 18. The Constitution also recognizes that the Executive Branch possesses preeminent powers to enforce congressional will. 16/ Yet, it has never been seriously suggested that the Constitution bars Congress from creating a private right of action, including a private right of action that will create incentives to comply with Federal law. Section 505 can be accurately viewed as a congressionally created federal cause of action to abate and deter a nuisance -- the pollution of the waters of the United

---

16/ Article II provides that "[t]he executive Power shall be vested in a President of the United States of America[,]" U.S. Const. Art. II, § 1, who "shall take Care that the Laws be faithfully executed * * *," Id. at § 3.

States. Such a right of action existed as a matter of federal common law (<u>Illinois</u> v. <u>Milwaukee</u>, 406 U.S. 91 (1972)), until displaced by the Federal Water Pollution Control Act of 1972. See <u>Sea Clammers</u>, 453 U.S. 1 (1981). It is unremarkable that in extinguishing that common law right, Congress simultaneously created a statutory surrogate. Indeed, any doubts that Congress can grant properly limited rights of action to private citizens must dissolve in light of the Supreme Court's long-standing approval of such conferrals.

The Supreme Court has consistently recognized that "[s]tatutory rights and obligations are established by Congress, and it is entirely appropriate for Congress, in creating these rights and obligations, to determine in addition who may enforce them and in what manner." <u>Davis</u> v. <u>Passman</u>, 442 U.S. 228, 241 (1979). The Court has thus stated:

> How to effectuate policy -- the adaptation of means to legitimately sought ends -- is one of the most intractable of legislative problems. Whether proscribed conduct is to be deterred by <u>qui tam</u> action or triple damages or injunction, or by criminal prosecution, or by some, or all, of these remedies in combination, is a matter within the legislature's range of choice.

<u>Tigner</u> v. <u>Texas</u>, 310 U.S. 141, 148 (1940). 17/ Congress, in

17/ Such powers were commonly created through <u>qui tam</u> statutes that had their origin before the Constitution was drafted, and are still in use today. These statutes empower private citizens, in carefully limited circumstances, to supplement governmental enforcement of civil laws and share in the resulting penalties and forfeitures. See Note, <u>The History and Development of Qui Tam</u>, 1972 Wash. U. L.Q. 81. <u>Qui Tam</u> actions can be traced back to the thirteenth century English common law. <u>Id.</u> at 86. The English Parliament enacted <u>qui tam</u> statutes, granting citizens
(continued...)

turn, has frequently utilized citizen enforcement, as a carefully limited supplement to Executive enforcement, in achieving its legislative ends. See, e.g., Clean Air Act, § 304, 42 U.S.C. 7604; Toxic Substances Control Act, § 20, 15 U.S.C. 2619; Endangered Species Act, § 11, 16 U.S.C. 1640(g); Resource Conservation and Recovery Act, § 7002, 42 U.S.C. 6972; Comprehensive Environmental Response, Compensation, and Liability Act, § 310, 42 U.S.C. 9659.

Rollins suggests that Section 505 is sui generis because it permits assessment of civil penalties in citizen enforcement actions. Def. Br. at 48. But this assertion is simply inaccurate. Congress has frequently authorized private citizens to pursue actions for civil penalties. See, e.g., False Claims Act, 31 U.S.C. 3730(b); Patent Act of 1952, 35 U.S.C. 292. Moreover, the Supreme Court has specifically approved of citizen actions seeking assessments of civil penalties under qui tam statutes.

---

17/ (...continued)
limited powers as private attorneys general, as early as 1400. Id. at 86 and n. 31. At the time the Constitution was ratified, statutory qui tam actions were a familiar feature of Anglo-American law; they comprised approximately five percent of the cases before the King's Bench, see Comment, Complex Civil Litigation and the Seventh Amendment Right to a Jury Trial, 51 U. Chi. L. Rev. 581, 598-599 (1984), and were commonly employed in the New World.

The Framers were unquestionably familiar with this rather commonplace authority. The legal practices of the Framers' era are, of course, highly relevant in determining the Framers' intent. See, e.g., Crist v. Bretz, 437 U.S. 28, 33 (1978) (double jeopardy analysis); Id. at 40-41 (Powell, J., dissenting).

Perhaps the leading case in this area is <u>United States</u> <u>ex rel. Marcus</u> v. <u>Hess</u>, 317 U.S. 537 (1943), involving a <u>qui tam</u> action brought under the False Claims Act. [18]/ The plaintiffs, alleging that various electrical contractors had defrauded the government, invoked the Act to assess (and share) in the resulting civil penalties. The Court recognized the venerable history of <u>qui tam</u> actions, noting that "'[s]tatutes providing for actions by a common informer, who himself has no interest in the controversy other than that given by statute, have been in existence for hundreds of years in England, and in this country ever since the foundation of our Government * * *.'" 317 U.S. at 541 n.4 (quoting <u>Marvin</u> v. <u>Trout</u>, 199 U.S. 212, 225 (1905)). It recited the observation in <u>United States</u> v. <u>Griswold</u>, 24 F. 361, 366 (D. Ore. 1885), that "[p]rosecutions conducted by such means compare with the ordinary methods as the enterprising privateer does to the slow-going public vessel." 317 U.S. at 541 n.5. The Court, concluding that "Congress has power to choose this method to protect the government from burdens fraudulently imposed upon it," <u>id</u>. at 542, thus gave explicit approval to the concept of <u>qui tam</u>, a result in full accord with its prior decisions in

_____

[18]/ The False Claims Act, as then in force, entitled the <u>qui tam</u> plaintiff to civilly prosecute frauds committed against the federal government and retain one-half of the penalty collected. See Act of March 2, 1863, 12 Stat. 696, 698, 31 U.S.C. 231-234 (1940).

_Marvin_ v. _Trout_, 199 U.S. 212 (1905), and _Adams_ v. _Woods_, 6 U.S. (2 Cranch) 336 (1805). [19]

Section 505 of the Clean Water Act confers far narrower enforcement powers than the _qui tam_ provisions addressed in _Hess_. For example, Section 505 requires a citizen plaintiff to give the government sixty days' notice of the suit and bars the citizen action if the government is prosecuting an action of its own. These provisions [20] yield substantial rights-of-way to the sometimes slower (but perhaps more prudently piloted) "public vessel." In addition, a Section 505 plaintiff who adheres to the mandates of the statute pursues a more pure form of "public interest" than the traditional _qui tam_ plaintiff. His suit is directed to curing violations primarily through injunctive relief and the specific and general deterrent effect of the associated penalties rather than providing private enrichment, and he may be subject to attorneys' fee liability [21] if his suit lacks merit. He has no claim to any portion of the civil penalties that the

----

[19] The Court went on to hold that a _qui tam_ action could be asserted even though it was brought _following_ a government indictment. 317 U.S. at 545-548. The Court recognized that "allowance of a _qui tam_ action under the circumstances "might bring unseemly races for the opportunity of profiting from the government's investigations," _id._ at 547, but concluded that the solution to this problem rested with Congress, rather than the courts, _id._ Congress later amended the False Claims Act to solve this and other problems. See Act of December 23, 1943, 57 Stat. 608 ("An Act to limit private suits for penalties and damages arising out of frauds against the United States"), _restated in_ Act of September 13, 1982, 96 Stat. 978.

[20] 33 U.S.C. 1365(b).

[21] See 33 U.S.C. 1365(d).

court, in its discretion, may assess. 22/ These factors combine

to place far greater limitations on the prosecutorial powers

conferred by Section 505 than the qui tam actions authorized by

Hess. 23/ Thus, there can be no doubt that Section 505, measured

---

22/ We note that Plaintiff implies that civil penalties due and
owing the Federal government can be diverted from the U.S.
Treasury to private parties to perform an environmental credit
project. ("Instead, the decisions as to whether the recipient of
the funds is to be the U.S. Treasury or an environmental project
is made by Defendant * * *." Pl. Br. 47) (See also Def. Br. 65).
This argument lacks merit. The legislative history of the Clean
Water Act is overpoweringly clear: civil penalties are only
payable to the United States Treasury. See, e.g., A Legislative
History of the Water Pollution Control Act Amendments of 1972,
93d Cong., 1st Sess. (Comm. Print 1973) at 830 (H.R. Rep. 92-911
at 133); id. at 1497 (Sen. Rep. 92-424 at 79). Moreover, several
courts have acknowledged that all penalties paid by citizen suit
defendants must be relinquished to the Treasury. See, e.g., Sea
Clammers, 453 U.S. at 14 n.25. ("Under the FWPCA, civil
penalties, payable to the Government, also may be ordered by the
court"); City of Evansville v. Kentucky Liquid Recycling, 604
F.2d 1008, 1014 n. 16 (7th Cir. 1979); Chesapeake Bay Foundation
v. Gwaltney, 791 F.2d 304, 306 n.2 (4th Cir. 1986); Chesapeake
Bay Foundation v. Bethlehem Steel Corp., 608 F. Supp. 440, 443-44
(D. Md. 1985) ("The citizen may seek * * * civil penalties
payable to United States Treasury * * *").

Plaintiff also inaccurately states that the EPA and
Congress have "specifically endorsed the practice of paying
settlement monies to support environmental credit projects." (Pl.
Br. 47-48). Plaintiff neglects to mention that the Agency's most
recent "Penalty Policy," February 11, 1986, enumerates very
specific limitations on the proper use of "credit projects." As
the policy makes clear, the Agency considers credit projects to
be the exception, rather than the rule. In order to ensure an
adequate deterrent and to advance consistently the purposes of
the Clean Water Act, the policy emphasizes that every settlement
should include a substantial monetary penalty component.
Moreover, the legislative history accompanying the most recent
amendments to the Clean Water Act, merely demonstrates Congress'
agreement with, and approval of, the limitations enumerated in
EPA's policy, in that, the use of credit projects is endorsed
only in "appropriate" circumstances.

23/ Indeed, Section 505's sixty-day notice requirement and
diligent prosecution limitation are remarkably similar to
(continued...)

against the benchmark provided by <u>Hess</u>, does not result in an unconstitutional delegation of government power to private citizens.

Moreover, under Section 505 a citizen may sue only "on his own behalf." <u>24/</u> Under Section 505 the citizen is principally vindicating his own rights and must meet specific standing requirements, as discussed <u>supra</u>. In contrast, the Appointments Clause (U.S. Const. Art. II, section 2) covers those laws in which public rights or responsibilities are addressed. It specifies the manner in which all "Officers of the United States," officers of the United States government, shall be appointed. Only such officers may exercise significant government power. <u>Buckley</u>. Serious constitutional issues would be raised if a non-Executive official were delegated the responsibility to execute the laws of the United States. But, such is clearly not the case with a Section 505 action, which is aimed at abating pollution which causes the plaintiffs' injury-in-fact. While it cannot reallocate the constitutionally-assigned Executive power, Congress can in order to enhance

_____

<u>23/</u> (...continued)
provisions of the present False Claims Act. <u>Compare</u> 33 U.S.C. 1365 <u>with</u> 31 U.S.C. 3730. The present False Claims Act, in turn, represents a "drastically limit[ed]" version of the Act examined in <u>Hess</u>. <u>United States</u> <u>ex</u> <u>rel. Nitkey</u> v. <u>Dawes</u>, 151 F.2d 639, 644 (7th Cir. 1945), <u>cert</u>. <u>denied</u>, 327 U.S. 788 (1946).

<u>24/</u>  Section 505(a), 33 U.S.C. § 1365(a):

    " (a) Except as provided in subsection (b) of this
    section, any citizen may commence a civil action <u>on his</u>
    <u>own behalf</u>...."  (emphasis added)

compliance with Federal law, create duties or rights in private

parties [25/] and not run afoul of the Appointments Clause.

> D.  Section 505 does not result in an unconstitutional interference with the prosecutorial powers of the Executive Branch.

Rollins further argues that Section 505 is also

unconstitutional on the grounds that it unjustifiably intrudes on

the constitutionally prescribed powers of the Executive Branch. [26/]

Rollins essentially contends that when Congress places

---

[25/]  Congress could have created a formally different scheme for the vindication of individual rights in this environmental area. Instead of including the citizen suit provision in the Clean Water Act, Congress could have passed the "Clean Water Nuisance Act." Such a statute could have authorized each person who had an adversely affected interest in a body of water to sue anyone who polluted it in violation of a permit, could have specified this as a nuisance cause of action, and could have provided that the remedy was an injunction plus costs and fees. No one could argue that such a statute violated the separation of powers doctrine and the Appointments Clause. The only difference between the hypothetical statute and the Clean Water Act is that citizen suits under the Act can result, in addition to an injunction and fees, in assessment by the court of penalties payable to the Treasury. This is no constitutional defect.

Congress authorized the court assessment of such penalties as part of a package of remedies designed to afford complete relief and maximum deterrence effect against violators of the Clean Water Act.  Moreover, since the violating party is before the court who imposes the civil penalty, it makes no sense, from a judicial economy perspective, to require the government to institute a separate judicial proceeding to recover penalties for those very same violations.  Again, under these circumstances, no constitutional defect is present.

[26/]  Rollins cites Nathan v. Smith, 737 F.2d 1069 (D.C. Cir. 1984), in support of its argument that the citizen suit provision unduly limits prosecutorial discretion.  Although Nathan is plainly not on point, we note that Defendant has incorrectly cited Judge Davis' concurring opinion as the opinion of the court.  See Def. Br. at 59.  The Nathan court did not reach any of the issues as set out in Rollins' brief.  Id.

enforcement authority in private citizens 27/, it must do so

under an enforcement scheme that preserves the prosecutorial

prerogatives constitutionally entrusted to the Executive Branch. 28/

---

27/  The United States does not agree that Section 505 places
governmental "enforcement authority" in private citizens.  The
authority asserted by citizens is not enforcement, but rather is
an expression of a private cause of action.  See supra n. 23, 24.

28/    Rollins asserts that, when citizens sue violators that the
EPA has chosen not to prosecute, EPA's enforcement discretion is
compromised.  In support, Rollins cites three examples of how EPA
supposedly exercises its discretion; these examples are
misleading or based on incorrect assumptions.

First, Rollins states that EPA does not expect NPDES permitees
(with technology-based effluent limitations) to be able to meet
their permit limits 100% of the time, and that the Agency
necessarily must use its enforcement discretion to remedy the
supposed unfairness that would result from suing a violator for
violations which are not its fault.  (Rollins brief at pp. 6-8,
50).  In fact, EPA does expect and insist that permittees comply
with their permits at all times. 40 C.F.R. 122.41(a).  National
Coal Ass'n v. EPA, 25 Env't Rep. Cas. 1612 (4th Cir., 1987).  Any
violation of the permit limit is a violation of the Act, for
which the permittee is strictly liable, regardless of good faith
or fault.  See, e.g., United States v. Earth Sciences, Inc., 599
F. 2d. 368, 374 (10th Cir. 1979).  The Clean Water Act imposes
liability without regard to fault.  See United States v. Texas
Pipeline Co., 611 F. 2d 345 (10th Cir. 1979); United States v.
Amoco Oil Co., 580 F. Supp. 1042 (D. Mo. 1984).  In response to
Marathon Oil Co. v. EPA, 574 F.2d 1253 (9th Cir. 1977), regarding
liability for temporary and exceptional non-compliance which is
unavoidable and unintentional, EPA promulgated the regulatory
"upset defense," 40 C.F.R. 122.41(n), which is the only available
defense to liability for such exceedances of permit limits, in
either EPA actions or in citizen suits.

The fact that the Act is a strict liability scheme is
not to suggest that the Administrator is divested of prosecu-
torial discretion.  To the contrary, the Administrator and the
Attorney General fully retain their authority to determine
whether a violator will be prosecuted by the United States for
Clean Water Act violations.  But the considerable discretion of
these Executive officials cannot be translated into a right,
vested in Defendant, not to be sued for violating the law.
Properly appointed "officers of the United States" make the final
determination whether the Defendant will be prosecuted by the

28/ (...continued)
United States.  Once they make this determination, there is no
constitutional infirmity in allowing citizens who can demonstrate
Art. III injury-in-fact to pursue a violator to abate a nuisance
and deter future injury.  While one could hypothesize a citizen
enforcement scheme which impermissably trenches upon Executive
discretion, for the reasons already described in detail above,
such a situation is clearly not presented here.

      Second, Rollins states that EPA exercises its enforcement
discretion in determining an appropriate penalty to request in
judicial enforcement actions.  (Rollins Brief pp. 11-12, 51).  In
fact, EPA recognizes that it is an element of the court's
discretion to assess an appropriate penalty, and thus EPA
routinely requests penalties of "up to the statutory maximum" in
its complaints.  In determining an appropriate settlement amount,
EPA uses the Clean Water Act Penalty Policy cited by Rollins.
However, the amount calculated is intended to be a settlement
"bottom-line", not a "starting point."  Furthermore, although EPA
believes that the penalty factors enumerated in the Policy are
appropriate for a court to consider when assessing a penalty,
absent settlement of the parties, EPA does not seek to -- and,
indeed, could not -- limit the court's discretion to the amount
determined by application of the Agency's settlement
calculations.

      Third, Rollins' discussion of EPA's concept of "significant
non-compliance" (SNC), the quarterly non-compliance report (NCR)
system, and the Enforcement Response Guide implies that the
Agency would not consider suing a discharger whose violations did
not fall into the SNC category.  (Rollins brief at pp. 8-11)
This is simply incorrect.  These classification and reporting
systems and guidelines are designed to both promote Agency
accountability and effectiveness and to target the very worst
offenders, given finite resources which make it impossible for
the Agency to sue every violator.  These tracking systems and
guidelines should not be taken to indicate that citizen or
federal actions are not appropriately aimed at violators who may
not fall within the Agency's highest priority categories for
enforcement.

      Plaintiff also misstates a point regarding EPA's
enforcement discretion.  Plaintiff erroneously implies that the
Government has a mandatory duty to enforce all violations of the
Clean Water Act. (Pl. Br. 41.)  The United States notes that the
DuBois case cited by Plaintiff as requiring the Administrator to
initiate enforcement, has been appealed to the United States
Court of Appeals for the Eighth Circuit. (Appeal filed on
                                                    (continued...)

Rollins argues that Section 505 does, in fact, inexorably intrude
on Executive Branch authority, divesting it of control over
enforcement of the Clean Water Act. 29/ The United States,
particularly well situated to evaluate this assertion, cannot
concur. We submit that Section 505 does not result in an
unconstitutional interference with the prosecutorial powers of
the Executive Branch. 30/

Section 505, as written, provides constitutionally
sufficient protection for the enforcement interests of the
Executive Branch. It expressly subjects citizen suits to federal
prenotification requirements and to displacement by federal

---

28/ (...continued)
November 18, 1986.) It is the United States' position that the
Administrator does not have a mandatory duty to take any
enforcement action. See, Heckler v. Cheney, 105 S. Ct. 1649
(1985),Sierra Club v. Train, 557 F.2d 485 (5th Cir. 1977); City
of Seabrook v. Costle, 659 F.2d 1371, 1374 (5th Cir. 1981);
Zemansky v. EPA, 24 Env't Rep. Cas. 1447 (D. Alaska, 1986 ); New
Mexico Citizens v. Train, 6 Env't Rep. Cas. (BNA) 2061, 2065 (D.
N.M. 1974).

29/ Rollins implies that the State and EPA reviewed Rollins'
permit violations and concluded that enforcement was not
appropriate. (Def. Br. 65-66). As noted supra, n. 1, the United
States takes no position on the merits of this case. The fact
that the United States did not pursue these violations should in
no way imply that the United States concluded that the potential
action had no merit.

30/ There are, of course, limits to the creation of private
enforcement powers. The constitutional questions presented by
citizen enforcement regimes, especially if they were to intrude
into the criminal enforcement arena, should not be lightly
dismissed. However, when the Executive's prerogatives are
adequately protected by limitations on the sweep of citizen
action, as is the case with Section 505, there is no interference
with the Executive's constitutional obligations.

enforcement or administration actions.[31]/  It also provides that

the federal government can intervene in the suit at any time. [32]/

Furthermore, it vests the power to assess civil penalties

---

[31]/  See 33 U.S.C. 1365(b)(1), and 101 Stat. 7, § 314.  Moreover, settlement or judgment in a citizen suit does not have any preclusive effect upon the enforcement authority of the United States.  It is a well-recognized principle of res judicata jurisprudence that the parties' settlement, or even the court's approval of a consent decree, cannot dispose of the valid claims of third parties.  See, e.g., United States Steel Corp. v. EPA Products Corp., 563 F.2d 1233, 1237-38 (5th Cir. 1977); United States v. Atlas Powder Company Inc., Civ. No. 86-6984 (E.D. Pa., March 16, 1987).  This principle is especially true in the case of governmental law enforcement.  The continuing authority of the United States to institute an enforcement action following a suit by a private plaintiff has been repeatedly upheld.  See, e.g., United States v. East Baton Rouge Parish School Board, 594 F.2d 56 (5th Cir. 1979); Hathorn v. Lovorn, 457 U.S. 255, 268 n.23 (1982); City of Richmond v. United States, 422 U.S. 358, 373-74 n.6 (1975); Donovan v. Cunningham, 716 F.2d 1455, 1462 (5th Cir. 1983).  "The United States has an interest in enforcing federal law that is independent of any claims by private citizens." United States v. East Baton Rouge Parish School Board, 594 F.2d at 58.  See generally 18 C. Wright & A. Miller, Federal Practice and Procedures § 4458 at 517-20 (1981).

Any other conclusion would be wholly inconsistent with the purposes of the Clean Water Act.  Private citizen suits under the Clean Water Act were intended to supplement and encourage federal and state enforcement efforts.  See, Environmental Policy Division, Congressional Research Service; A Legislative History of the Water Pollution Control Act Amendments of 1972 1497-98 (1973); and Senator Chafee's remarks on the Water Quality Act of 1987, 133 Cong. Rec. S.737 (daily ed. Jan. 14, 1987).  Government enforcement, however, remains the primary mechanism for ensuring that the objectives of this Act are achieved.  Yet, if the United States were legally precluded from filing a subsequent action because a citizen suit on the same violations had been resolved, the entire enforcement scheme envisioned by Congress would be seriously disrupted, and serious separation of powers issues would be present.

[32]/  Section 505(c)(2) provides that the federal government "if not a party, may intervene as a matter of right."  33 U.S.C. 1365(c)(2).

strictly within the discretion of the courts. [33/]  Thus, Section 505 extends much more extensive protection to Executive Branch enforcement interests than that traditionally provided in _qui tam_ statutes.  See, _e.g._, <u>United States ex rel. Marcus</u> v. <u>Hess</u>, 317 U.S. 537, 540 (1943) (describing former provisions of the False Claims Act, 31 U.S.c. 231-234 (1940)).  Given these crucial limitations and the accepted validity of _qui tam_ statutes, see <u>Hess</u>, <u>supra</u>, Rollins' challenge to Section 505 simply cannot amount to a colorable claim of unconstitutionality. [34/]

## CONCLUSION

For the reasons set forth in this <u>amicus curiae</u> brief, the United States urges the Court to uphold the constitutionality of Section 505 of the Clean Water Act.

---

[33/]  33 U.S.C. 1365(a).

[34/]  Indeed, the claim that Section 505 infringes on Executive prerogatives is also strikingly similar to the claims raised against the False Claims Act in <u>Hess</u>.  The Supreme Court, noting that such claims are "directed solely at what [one] thinks Congress should have done rather than what it did," 317 U.S. at 546-547, suggested that the remedy rested with Congress rather than the courts, <u>id.</u>

27

Respectfully submitted,

H. HENRY HABICHT, II
  Assistant Attorney General

SAMUEL A. ALITO, JR.
  United States Attorney

*Douglas A. Cohen/srb*

NANCY B. FIRESTONE
DOUGLAS A. COHEN

Attorneys, Department of Justice
  Washington, D.C. 20530
  (202) 633-1442

90-1-24-219
APRIL 1987